IN THE COURT OF APPEALS OF TENNESSEE
AT MEMPHIS
February 25, 2015 Session

**IN RE BROOKELYN W.**

**Appeal from the Chancery Court for Shelby County**
**No. CH121354     Walter L. Evans, Chancellor**

_____

**No. W2014-00850-COA-R3-PT - Filed March 24, 2015**

_____

In this termination of parental rights case, mother and step-father appeal the trial court's decision to set aside a decree of adoption entered by default, as well as the trial court's subsequent finding that they failed to prove grounds for the termination of biological father's parental rights. We affirm the trial court's decision to set aside the adoption decree, but reverse the trial court's determination that mother and step-father failed to prove grounds for termination. Instead, we conclude that clear and convincing evidence exists to show that biological father abandoned the child by willfully failing to visit and support the child. As such, we remand to the trial court for a determination of whether termination is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

Bradley C. Ball, Memphis, Tennessee, for the appellants, Joseph C.C. and Shanna R.C.

No brief filed by the appellee, Evan R.W.

**OPINION**

**Background**

Petitioner/Appellant Shanna R.C. ("Mother") and Respondent Evan R.W.

(Father") had one child together, Brookelyn ("the child"), born in 2007.[1] The parties, who were never married, separated in 2009, and Mother took physical custody of the child. At that time, the parties did not seek court intervention to determine any visitation or custody matters. Mother, however, allowed Father to visit the child at the home of the child's paternal grandmother until June 2010, when Mother grew concerned for the child's safety due to a lack of stability in grandparents' home.[2] From June 2010 until the filing of the underlying petition in this case, Father had no visitation with the child and generally paid no support.[3]

On March 26, 2012, Mother and Father appeared in the Tipton County Chancery Court at the request of the Tipton County District Attorney General's office. At this hearing, the Tipton County Juvenile Court entered an agreed order requiring Father to place the child on his health insurance policy. The Tipton County Chancery Court order indicated that it provided only for the medical insurance of the child, and that any further support requirements would be determined by the parties outside of court. On July 10, 2012, Father filed a Petition to Establish Parentage and Visitation with the child in the Tipton County Juvenile Court. The petition asked the court to establish a visitation schedule and set child support.

Mother subsequently married Petitioner/Appellant Joseph C.C. ("Step-Father" and together with Mother, "Petitioners") on August 26, 2012, and the Petitioners filed a Petition to Terminate Father's Parental Rights on August 27, 2012, on the grounds of abandonment by willful failure to visit and/or willful failure to support.[4] The petition asked that Step-Father be permitted to adopt the child. Father was undisputedly served and appeared before the trial court, where he was informed that he had thirty days to obtain an attorney. Father, however, failed to respond to the petition, and a default judgment was entered against Father. Father subsequently filed an answer to the petition on December 31, 2012, and a voluntary acknowledgment of paternity on January 7, 2013. The trial court nevertheless entered an order granting Petitioners' request for termination and adoption on January 7, 2013.

[1] This Court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

[2] Specifically, paternal grandmother expressed to Mother her fear that her husband was "giving her prescription drugs and raping her."

[3] Father asserted that he paid approximately $200.00 in support for the child at some point in 2010; however, the record is unclear as to whether this alleged payment occurred before or after the visits between Father and the child ended.

[4] The petition also alleged abandonment by failure to timely establish paternity. This ground was later abandoned, however, and is not at issue on appeal.

On January 11, 2013, Father, represented by different counsel, filed a motion to set aside the final decree. Father asserted that his delay in responding to the termination petition was due to confusion with his previous attorney. Father also submitted an affidavit denying that he had willfully failed to visit and/or support the child. The trial court eventually granted Father's request to set aside the termination and adoption decree on September 10, 2013. The child was appointed a Guardian Ad Litem, and the parties proceeded to discovery. Thereafter, Father also filed a motion to be allowed some visitation with the child.

Prior to trial, Father filed a Statement of Admissions in the trial court, in which he generally admitted to his lack of visitation, his failure to even attempt visitation, his criminal record, and the fact that he was aware of Mother's address. The trial court held a trial on Petitioners' termination petition on February 27, 2014. Petitioners and their witnesses generally testified that Father made no attempt to visit or support the child during the four months before the filing of the petition, or at any time after June 2010. In addition, the witnesses testified that the child does not know Father and that she is in a happy and stable home with Petitioners.

As can be expected, much of the testimony concerned the circumstances surrounding Father's alleged failure to visit and support the child. Mother testified that she left Father because of his violence and alcoholism, which caused her to question both her own and the child's safety when around Father. Mother testified, however, that despite her concerns, Father still had regular visitation with the child in the months after the parties' separation. Indeed, after the parties' separation, it was undisputed that Mother regularly drove the child from Shelby County to paternal grandmother's home in Tipton County, where Father was permitted to visit with the child. Once Mother grew concerned about the lack of stability in paternal grandmother's home, however, Mother stopped taking the child to the home of paternal grandmother. Mother testified that she never denied any request by Father to visit the child after the child's visits to paternal grandmother were terminated;[5] instead, Father simply never requested visitation with the child or inquired about the child in any way until the filing of his visitation petition in July 2012. Mother submitted phone records to show that Father had not called Mother during the months preceding the filing of the termination petition.

Mother admitted, however, that an incident occurred in January 2011, which caused Mother to obtain an *ex parte* order of protection against Father on January 5,

---

[5] After the termination petition was filed, Father's attorney communicated several requests that Father be allowed visitation with the child. Mother did not dispute that she opposed this visitation, as she believed that it would be traumatic for the child to learn that Step-Father was not her father, given the uncertainty involved as to whether Father would be in her life once the termination petition was determined.

2011. Specifically, Mother testified that while she was driving around the area of her home in Shelby County in January 2011, Father saw Mother in her car on his way to stop by Mother's home unannounced. When Father saw Mother driving, he followed her and honked his horn to get Mother's attention. Mother then drove to the nearby police station and Father did not continue to follow her. Mother testified that she was frightened by the incident due to Father's history of domestic violence. Father did not deny that this incident occurred, but characterized it as a friendly visit in an attempt to see the child while he was in Memphis on other, unrelated, business. Father did not deny that he gave Mother no notice regarding his intent to come by Mother's home. The order of protection was dissolved three months after its issuance, and no other orders were ever entered preventing Father from having contact with Mother or the child.

Mother further testified Father paid no monetary support for the child since the parties' separation. In addition, since at least June 2010, the child received no gifts or in-kind support of any kind from Father. Mother admitted at trial that she and the child had moved on from Father, and as such, she did not want support from Father. However, Mother testified that she never refused to accept any support from Father; instead, none was ever offered. Mother also testified that Father eventually placed the child on his health insurance in November 2012, but that she did not receive the child's insurance card from Father until January 2013.

At the time of trial, Father was married with two children and had been employed with Cooper Moving since Fall 2010. Father admitted that in addition to the domestic violence calls during the parties' relationship, the police had also been called to his current home for domestic violence issues. Father further admitted that after the parties' separation, he continued to call Mother, often drunk and angry. Father stated, however, that Mother had "instigated" these episodes.

Father admitted that he had no visitation with the child in the four months preceding the filing of the Petition, although he had a job, a cell phone, and transportation. While Father placed the blame for the lack of visits on Mother's refusal to cooperate with him, Father admitted that he did not contact Mother to arrange visitation at any time after June 2010, other than his ill-advised trip to Mother's home. Father testified that other than his petition for visitation, he did nothing to request visitation in the months leading up to the filing of the termination petition. Indeed, Father's own Statement of Admissions states that he "has not made any attempts to visit with the child since early 2010." Father indicated that some of this failure was due to Mother's move from Tipton County to Shelby County; however, Father admitted in his Statement of Admissions to the trial court that he was aware of Mother's address "[s]ince the parties' divorce."[6]

---

[6] Presumably, by "divorce," Father means the parties' separation, as they were never married.

Father also admitted that he never tried to request visitation by sending a letter to Mother's home.

Father characterized Mother's refusal to allow the child to visit with paternal grandmother as due to Father's new romantic relationship; however, Father did not deny Mother's allegations regarding the instability in paternal grandmother's home. Father finally admitted that during the four months preceding the termination Petition, Mother did not "do anything to keep [him] from having visitation" with the child.

Father testified that although he worked full-time earning $35,000.00 per year, he had never provided support for the child after the parties' separation, other than one alleged payment in 2010. Father admitted that he had a duty to support his child and that he earned sufficient income to provide support for the child. When asked what Father's excuse for his failure to pay support was, Father indicated that it was his belief that visitation and support "go hand in hand," and that he would not send support without some assurance that he could see his child. Father further admitted that although he was ordered in March 2012 to provide health insurance for the child, the child was not placed on Father's insurance until November 1, 2012, and no health insurance card for the child was mailed to Mother until January 2013. Father testified that the delay in coverage was due to a waiting period imposed by the insurance company, and that he was mistakenly under the impression that the insurance company would send a card to Mother directly.

At the conclusion of trial, the trial court found that Father's visitation petition evinced his intent to establish a relationship with the child. Specifically, the trial court held that by filing the visitation petition, Father "represented his interest and concern for providing support and providing visitation within the four-month period preceding the filing of the Petition for Adoption." The trial court further found that Mother "frustrated the attempt by [Father] to just visit the child." As such, the trial court concluded that Petitioners failed to establish grounds for termination by clear and convincing evidence. On March 24, 2014, the trial court entered an order, incorporating its oral ruling by reference. Petitioners appealed. While the appeal was pending, the trial court also entered an order dismissing Father's request for visitation.

## Issues Presented

Petitioners present three issues, which are taken, and slightly restated, from their brief:[7]

    1.    Whether the trial court erred in finding that Petitioners

[7] Father did not file a brief or otherwise participate in this appeal.

failed to prove, by clear and convincing evidence, that Father abandoned the child by failing to visit and failing to pay support?

2.      Whether the trial court erred in finding that Petitioners failed to prove, by clear and convincing evidence, that termination is in the child's best interests?

3.      Whether the trial court erred in setting aside the final decree of adoption following a default judgment against Father?

## Default Judgment

We begin with Petitioners' argument that the trial court erred in setting aside the final decree of adoption that was entered due to Father's default. Rule 55.02 of the Tennessee Rules of Civil Procedure provides: "For good cause shown the court may set aside a judgment by default in accordance with Rule 60.02." Accordingly, Father's request to set aside the order of adoption is governed by Rule 60.02 of the Tennessee Rules of Civil Procedure.[8]

Rule 60.02 provides, in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

---

[8] We note that Rule 60.02 generally applies to requests for relief from final judgments. *See* Tenn. R. Civ. P. 60.02 (allowing the court to "relieve a party or the party's legal representative from a final judgment."). In this case, however, the adoption decree was not final because thirty days had not passed since it was entered. However, Rule 55.02 clearly contemplates that all requests for relief from a default judgment will be considered under Rule 60.02. Other Courts have similarly applied Rule 60.02 even when the motion for relief from the default judgment was filed less than thirty days after the judgment was entered. *See* **State ex rel. Jones v. Looper**, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); **Nortell v. Nortell**, No. 01A01-9208-CV-00315, 1993 WL 1875, at *1–*2 (Tenn. Ct. App. 1993). Furthermore, regardless of whether Father's motion is construed under Rule 60.02 or Rule 59.04 ( motion to alter or amend a non-final judgment), the appropriate standard is an abuse of discretion. *See* **Stovall v. Clarke**, 113 S.W.3d 715, 721 (Tenn. 2003).

(3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than a year after judgment, order or proceedings was entered or taken.

Tenn. R. Civ. P. 60.02.

The procedural history of this case is not in dispute. Petitioners filed their termination petition on August 27, 2012, one day after their marriage and mere weeks after Father filed his visitation petition in another county. The summons was served on Father on September 21, 2012. Accordingly, Rule 12.01 indicated that Father had until October 21, 2012 to answer the complaint. *See* Tenn. R. Civ. P. 12.01 ("A defendant shall serve an answer within 30 days after service of the summons and complaint upon the defendant."). Father did not file an answer to the petition by October 21, 2012. Thus, the Petitioners filed a motion for a default judgment. The record indicates that on November 16, 2012, Father appeared before the trial court, and the trial court allowed Father an additional thirty days to respond to the petition. When Father did not respond within this time frame, the trial court entered an order of default on December 18, 2012. Nearly two weeks later, on December 31, 2012, Father filed an answer to the petition for termination of his parental rights, by and through a Memphis Area Legal Services attorney. On January 7, 2013, however, the trial court held a hearing on Petitioners' petition for termination of Father's parental rights. On the same day, the trial court entered an order terminating Father's parental rights and granting Step-Father's request to adopt the child.

A few days later, on January 11, 2013, Father filed a motion to set aside the default judgment and the final decree of adoption. At this time, Father had retained private counsel.[9] Father attached a sworn affidavit stating that his delay in responding to the petition was due to confusion as to where he could receive legal assistance. According to Father, he was first told to consult Memphis Area Legal Services, but they referred him to Tipton County Legal Services because Father resides in Tipton County. When he consulted with Tipton County Legal Services, he was informed that they could not assist him because the termination proceeding was in Shelby County. Father then returned to Memphis Area Legal Services and entered into a contract for services on December 13, 2012. Father indicated that he was under the impression that the Memphis Area Legal

---

[9] Father later indicated that his delay in hiring private counsel was "lack of money."

Services attorney would file an answer in the termination case; the Memphis Area Legal Services attorney did file an answer to the petition, but not until December 31, 2012. Father further alleged that he received no notice of the January 7, 2014 hearing. Finally, Father alleged that he had a meritorious defense against the allegations in the termination petition, in that he had neither willfully failed to visit or willfully failed to support the child.

The trial court ultimately held a hearing on Father's motion to set aside the default judgment on May 1, 2013. At the conclusion of the hearing, the trial court made oral findings of fact and conclusions of law. Specifically, the trial court found that Father's delay in filing an answer to the termination was due to "some misunderstanding with the legal services attorney and/or their representative representing his interests." Further, the trial court found that Father had raised possibly meritorious defenses to the termination petition, in that Father's visitation petition evidenced his desire to create a relationship with the child. As such, the trial court ruled that it was appropriate to set aside the default judgment.

The trial court's decision to grant or deny a motion to set aside a default judgment is reviewed under the abuse of discretion standard. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. *Johnson v. Richardson*, 337 S.W.3d 816, 819 (Tenn. Ct. App. 2010) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). We will not overturn the trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). When considering a motion to set aside an order entered by default, we must construe Rule 60.02 liberally. *Nelson v. Simpson*, 826 S.W.2d 483, 484 (Tenn. Ct. App. 1991). As this Court has explained:

> In deciding whether to grant a rule 60.02 motion to set aside the default judgment, courts consider three criteria: 1) whether the default was willful; 2) whether the defendant has asserted a meritorious defense; 3) the amount of prejudice which may result to the non-defaulting party. [*Tenn. Dep't of Human Serv. v. Barbee*, 689 S.W.2d 863, 866 (Tenn.1985).] If there is any reasonable doubt about whether the judgment should be set aside, the court should grant relief. *Nelson v. Simpson*, 826 S.W.2d 483, 486 (Tenn. Ct. App. 1991).

*Reynolds v. Battles*, 108 S.W.3d 249, 252 (Tenn. Ct. App. 2003). Further, Rule 60.02

contains an express requirement that a motion under this rule, depending on the ground asserted for relief, must be sought either within one year, or within a reasonable time. *See* Tenn. R. Civ. P. 60.02.

Here, the trial court appears to have found that Father's delay was not willful because it was due to a misunderstanding regarding his representation. When the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See* ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995). "The weight, faith, and credit to be given to any witness's testimony **lies in the first instance with the trier of fact**, and the credibility accorded will be given great weight by the appellate court." ***Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC***, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002) (emphasis added). Here, the trial court specifically credited Father's explanation for the delay in responding. Because this issue hinges on the trial court's assessment of Father's credibility, we cannot conclude that the trial court abused its discretion in crediting Father's explanation.

The trial court also found that Father had put forth a meritorious defense in that he had presented his sworn affidavit that he had made an effort to visit and support the child in the four-month period preceding the filing of the termination petition and that any failure on his part was not willful. As explained by this Court in a similar case wherein the defendants sought to set aside a default judgment: "The [d]efendants are correct in their assertion that they were not required to prove their defense, but they were required to assert a meritorious defense, namely a defense that at least had the potential of succeeding at trial." ***State of Franklin Bank v. Riggs***, No. E2010-01505-COA-R3-CV, 2011 WL 5090888 (Tenn. Ct. App. Oct. 27, 2011) (requiring the defendants to submit some evidence in support of their meritorious defense). Thus, Father was merely required to submit some evidence of a defense that had the potential to succeed at trial. Here, Father submitted sworn testimony indicating that he did not willfully fail to visit or support the child. Under these circumstances, we conclude that the trial court did not err in determining that Father properly asserted a meritorious defense.

Finally, we consider the prejudice to the Petitioners that would result from setting aside the trial court's judgment. Petitioners alleged in their response to Father's motion to set aside the default judgment that prejudice would result if Father "was allowed to ignore the legal process until termination and adoption was granted, and then finally offer his legal argument, however void of substance." As previously discussed, however, Father did assert a sufficient meritorious defense to the termination proceeding. In addition, he

filed his answer to the termination complaint prior to the entry of any order granting the adoption. Accordingly, Petitioners at least had some notice that Father intended to dispute the termination proceeding. Moreover, a request to terminate a parent's right to a child is "one of the most difficult [questions] this Court is called upon to address." ***Matter of Sipe***, No. 01A01-9704-JV-00185, 1998 WL 95227, at *7 (Tenn. Ct. App. Mar. 6, 1998). As discussed in detail, *infra*, terminating a parent's fundamental parental rights results in severe consequences to both the child at issue and the parent. *See **In re Serenity B.***, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *1 (Tenn. Ct. App. May 21, 2014), *perm. app. denied* (Tenn. July 14, 2014). Under these circumstances, we decline to conclude that the trial court abused its discretion in setting aside the final decree of adoption in this case.

## Termination of Father's Parental Rights

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. ***Nash-Putnam***, 921 S.W.2d at 174–75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W .B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

**Grounds for Termination**

In this case, Petitioners alleged two grounds for termination of Father's parental rights: abandonment by willful failure to visit and abandonment by willful failure to support pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) and Tennessee Code Annotated Section 36-1-102(1)(A)(i). In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . . .

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for

-11-

adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or a guardian or guardians . . . have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i).

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(I) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .
Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark.App. 71, 32 S.W.3d 758, 760 (2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 393 Pa.Super. 355, 574 A.2d 649, 652 (1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863–64 (internal citations and footnotes omitted).

We recognize that the statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i). In the present case, the four-month period for purposes of establishing abandonment by failure to visit and support is April 25, 2012 until August 26, 2012, the day before the petition was filed. However, in determining whether a parent's conduct was "willful," it may become necessary in a given case to evaluate events occurring prior to the start of the four-month period. Thus, events occurring prior to the four-month period may bear on the "willfulness" of the parent's conduct during the four-month period. *See **In re Alex B.T.***, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) ("Courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child[.]"); *see also **In re Keri C.***, No. E2010-00381-COA-R3-PT, 2010 WL 4739706, at *16 (Tenn. Ct. App. Nov. 22, 2010) (explaining that the parent's conduct prior to the four-month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's conduct during the four-month period).

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Adoption of Angela E.***, 402 S.W.3d at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). This Court reviews questions of law *de novo* with no presumption of correctness. ***Id.***

**Willful Failure to Support**

We begin with Petitioners' contention that Father abandoned the child by willfully failing to support her. *See* Tenn. Code Ann. § 36-1-102(1)(A)(I). There is no dispute in this case that Father paid no support to Mother on behalf of the child during the relevant

time period.[10]

Further, there is no dispute that during the relevant four-month period, Father made no effort to send money, gifts, cards, or any other support to Mother for the child. Finally, there appears to be no dispute that Father was gainfully employed during the relevant time period, and therefore, was financially capable of providing support for the child. Indeed, Father unequivocally admitted at trial that he was financially able to provide support for the child in the four months preceding the termination petition.

Father argued at trial, however, that his failure was not willful for two reasons: (1) he attempted to pay the child's insurance during this time, as ordered by the Tipton County Juvenile Court; and (2) in the Tipton County Juvenile Court, the parties agreed that Father would not pay monetary child support to Mother. Here, the record shows that Mother and Father appeared in Tipton County Juvenile Court in March of 2012. At that time, the parties came to an agreement that Father would be named the legal father of the child, that Father "owes a duty of support to" the child, and that Father would provide medical insurance for the child "when available at a reasonable cost" through Father's employer. Finally, the order stated that: "This is a Medical Only Order as child support has been addressed by the parties and is not to be enforced by the State at this time."

We first reject Father's argument that he was complying with the Tipton County Juvenile Court's order to provide medical coverage to the child during the relevant time period. Father's testimony at trial on this issue was weak, at best. First, there is no dispute that health insurance coverage was available to Father at a reasonable cost from his employer at the time the Tipton County Juvenile Court order was entered. Father testified that he immediately complied with the order to provide medical coverage for the child, but that his insurance instituted a 90-day waiting period on coverage. However, two documents in the record directly contradict Father's testimony. First, a document from Father's insurance company indicates that coverage was not effective for the child until November 1, 2012, a total of 221 days after the order was entered requiring Father to obtain insurance for the child. The document also shows that this insurance was available to Father as early as January 1, 2011, the date on which his coverage became effective. Next, the record contains a letter sent to Mother containing the child's insurance card. The postage date on this letter indicates that Mother did not receive the child's insurance card until January 18, 2013, nearly ten months after Father was ordered to provide coverage. Father's only explanation for this substantial delay was that he made every effort to comply with the Tipton County Juvenile Court's order and that he assumed that

---

10 As previously discussed, Father alleged at trial that he paid Mother approximately $200.00 shortly after the parties' separation. However, this alleged support occurred prior to the relevant four-month period at issue in this case.

the insurance company would send the child a copy of her insurance card. Father admitted that he only sent Mother the child's insurance card when he was directed to do so by his attorney.

The trial court did not make a specific finding as to Father's attempts to provide medical insurance for the child. As previously discussed, there is no dispute that Father provided no support for the child during the relevant four-month period. Accordingly, we may consider events occurring outside the four-month period in determining whether this failure was willful. *See Alex*, 2011 WL 5549757, at *6. From our review of the record, we conclude that the evidence shows that Father willfully failed to comply with the Tipton County Juvenile Court's order to provide insurance coverage for the child. Father testified that there was a ninety-day delay in coverage after a request to add a person to his insurance. Mother disputed that was the case, but even crediting Father's testimony regarding the 90-day delay, the child should have been covered under Father's insurance on June 26, 2012. However, there is no dispute that the child was not covered until over four months later. Indeed, Father's testimony regarding his own health insurance undercuts his testimony regarding the delay. Specifically, Father testified that he began work at his current employment in Fall 2010. His insurance coverage went into effect on January 1, 2011. Accordingly, Father's insurance went into effect, at the latest, approximately four months after any request for coverage. A four-month delay in the child's coverage would have resulted in her obtaining coverage, at the latest, on approximately September 1, 2012. The child did not receive coverage until two months later. This evidence tends to show that Father substantially delayed in complying with the Tipton County Juvenile Court's order. Further, Father admitted at trial that he received a copy of the child's insurance card but failed to send the card to the child's Mother until months after coverage became effective. Under these circumstances, although Father did eventually comply with the Tipton County Juvenile Court's order to provide health insurance for the child, his substantially belated effort to do so constitutes, at best, token support. Tenn. Code Ann. § 36-1-102(1)(B) (defining "token support" as "support, under the circumstances of an individual case, [that] is not significant considering the parent's means").

Even if we were to conclude that Father did not willfully fail to comply with his duty to provide the child with medical coverage, this fact does not excuse Father from his duty to also provide monetary support for the child. As previously discussed, there is no dispute that Father was financially able to provide support for the child during the relevant four-month period; indeed, it appears from the record that Father was gainfully employed and able to provide support for the child as early as Fall 2010, when Father became employed at his current job. Nevertheless, Father argues that his failure to pay support was not willful because he was not ordered to do so in the Tipton County Juvenile

-15-

Court order, which he contends is illustrative of Mother's refusal to accept support. A very similar factual scenario was recently presented in *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) (no perm. app. filed). In *Kiara*, Father asserted that his failure to support the child was not willful because the parties had previously been to court and biological father was only ordered to pay for the child's medical expenses. Specifically, biological father argued that the prior order constituted a waiver of support. The Court of Appeals rejected this argument, explaining:

> This argument is grounded in a misreading of the divorce decree, in which the [prior] court reserved rather than waived the issue of child support. [The] [m]other testified at trial that she did not waive [biological] [f]ather's duty to pay child support. Moreover, whether [biological] [f]ather had ever been ordered by a court to pay child support or advised of his duty to do so is irrelevant.

*Id.* at *8. The Court of Appeals based its conclusion on the well-settled principle that a parent's duty to support his or her child exists regardless of an order from a court. Tennessee Code Annotated Section 36-1-102(1)(H) states that "every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Thus, a parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support. *See e.g., In re Shandajha A. G.*, No. E2012-02579-COA-R3-PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013). As discussed by this Court in *State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL 2002577 (Tenn. Ct. App. July 6, 2006):

> It is well settled in Tennessee that biological parents must, as a general matter, support their children until they reach the age of majority. *See* T.C.A. § 34-1-102(a), (b) (2001); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn. 1987). Their support obligations are joint and several, and the extent of their obligations depends on their ability to provide support . . . . The parent's obligation to support, as well as the child's right to support, exist regardless of whether a court order exists, and regardless of whether the parents were ever married.

*Carter*, 2006 WL 2002577, at *2. In this case Father even acknowledged his duty to support the child in the Juvenile Court order, but made no effort to provide any

support, monetary or insurance-wise, immediately following the entry of the order. Thus, the fact that the Tipton County Juvenile Court order did not specifically address support is not an excuse for Father's failure to support his child.

At trial, Father and his counsel emphasized that Mother never requested support from Father. Mother did admit in her testimony that she did not request that Father pay support for the child because she hoped that both parties could simply move on with their lives apart. Father asserts that Mother's refusal to accept support is evidenced by the Tipton County Juvenile Court order, which does not obligate Father to pay child support. When assessing the willfulness of a parent's failure to pay child support, we have said that the failure of a child's parents to ask for monetary support may be considered as "part of the constellation of facts that must be considered to assess willfulness," when it is coupled with a "rebuff" of the parent's inquiry about specific items that were needed, and the parent's provision of in-kind support during visits. *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at \*23 (Tenn. Ct. App. Mar. 12, 2013). We disagree, however, with Father's characterization of the Tipton County Juvenile Court order. The order states that the parties have addressed monetary support outside of court. Nothing in the order suggests that the parties agreed that Father was under no duty to provide monetary support for the child.

Further, Father admitted that other than one payment to Mother at her request years ago, Father never inquired as to whether Mother needed any items for the child, never offered Mother any items for the child, and never directly provided any money, in-kind support, or gifts for the child. Other courts have indicated that a custodial parent's failure to seek support from the non-custodial parent is insufficient to excuse a non-custodial parent's failure to support a child. *See David A. v. Wand T.*, No. M2013-01327-COA-R3-PT, 2014 WL 644721, at \*8 (Tenn. Ct. App. 2014) (no perm. app. filed); *In re Jacobe M.J.*, 434 S.W.3d 565 (Tenn. Ct. App. 2013) (discussed in detail, *infra*). Indeed, this Court held that failure to support "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946, 950 (1997); *In re Serre*, 77 Ohio Misc.2d 29, 665 N.E.2d 1185, 1189 (1996); *Panter v. Ash*, 177 Or.App. 589, 33 P.3d 1028, 1031 (2001)). Here, Father, by his own admission, made no efforts to provide financial support for the child during the relevant time period. Consequently, Mother's statement that she did not want support from Father is insufficient to excuse Father's duty to support, as her statement neither prevented Father from attempting to support the child nor constituted a significant interference with any non-existent efforts on Father's behalf.

In a somewhat similar case, *In re Jacobe M.J.*, 434 S.W.3d 565 (Tenn. Ct. App. 2013), the biological father of the child did not pay support for the child during the relevant four-month period. Biological father argued that his non-support was excused, however, because there was no court order requiring him to pay support, the custodian of the child did not request support, and he was under the impression that a restraining order prevented him from contacting the child's custodian. *Id.* at 569. The Court of Appeals rejected these arguments, concluding that biological father's duty to support the child was not dependent on a court order or request from the child's custodian and that the restraining orders at issue contained no provision preventing Father from contacting the custodian or providing support for the child. *Id.* at 572. Similarly, here, Father places the burden on Mother to seek support for the child and points to court orders that he alleges excuse him from compliance. However, in this case, the order of protection had long since expired by the time of the relevant four-month period, and the Tipton County Juvenile Court order contains no provision that relieves Father of his duty to provide for the child.

Finally, we note that the fact that Father willfully refused to provide support for the child is expressed through his own testimony. Repeatedly at trial, Father testified to his belief that he was under no obligation to pay support for the child unless and until he was given assurances that he could visit the child. Specifically, Father testified that while he could have mailed a support check to the child, he refused to do so unless he could "know if [he] was going to be able to see [the child] or not" and that child support and visitation "[g]o hand in hand." It is well-settled, however, that: "The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially." *In re Audrey S.*, 182 S.W.3d at 864. Thus, the record shows that Father made an "intentional or voluntary" choice to withhold support from his child unless and until he was allowed to visit the child. *Id.* This is the very definition of willful conduct.

Based on the totality of the evidence, we conclude that Petitioners presented clear and convincing evidence to establish the ground of abandonment by willful failure to support the child in the relevant four-month period. Although only one ground for termination of parental rights must be met, the Tennessee Supreme Court has directed this Court to review the findings of fact and conclusions of law as to each of the trial court's grounds for termination in order to avoid unnecessary remand. *See In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we go on to consider whether the ground of abandonment by failure to visit was also established in this case.

**Willful Failure to Visit**

As previously discussed, another way to prove abandonment is by establishing "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Here, it is undisputed that Father had no visitation with the child in the four months preceding the filing of Petitioners' petition. Father contended at trial, however, that Petitioners cannot prove the ground of abandonment by willful failure to visit because: (1) Mother had previously filed an order of protection against Father that prevented him from having contact with her; and (2) Father filed a petition in the Tipton County Juvenile Court to establish his paternity and set visitation and support for the child, which he was actively pursuing at the time of the termination petition. Thus, Father asserted while he was not exercising visitation with the child, he was pursuing judicial intervention to facilitate his visitation with the child, somewhat like the situation presented in *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007).[11]

We begin first by disposing of Father's assertion that he was thwarted in his visitation by Mother's order of protection. A similar argument was advanced in *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) (no perm. app. filed). In *Kiara*, this Court rejected biological father's argument that his failure to visit was not willful due to a prior order of the court preventing him from having visitation with the child. The Court concluded that biological father could have returned to court at any time to modify the order, but that he chose to not to pursue that action. According to the *Kiara* Court: "This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit." *Id.* at *6 (citing *In re Elijah B.*, E2010-00387-COA-R3-PT, 2010 WL 5549229 at *8 (Tenn. Ct. App. Dec. 29, 2010)); *see also Tenn. Dep't of Children's Servs. v. J.A.H.*, E2005-00860-COA-R3-PT, 2005 WL 3543419 at *6 (Tenn. Ct. App. Dec. 28, 2005) (holding that the biological father's decision not to submit to testing that was a precondition to further visitation constituted a "willful decision to discontinue visiting his son"). Further, the Court held that even though there had previously been an order of protection preventing biological father from having contact with the child, the order had been dissolved long before the relevant four-month period, and that biological father's knowledge of its dissolution was immaterial. *Kiara*, 2014 WL 2993845, at *6 ("If . . . as [biological] [f]ather asserts, he knew that the order of protection had been entered against him, it follows that he at least

---

11 Father filed no brief in this Court. In order to ensure that Father's rights are protected, we have attempted to address any arguments fairly raised in the trial court. We note, however, that Father cited no specific legal authority in the trial court. Thus, we must rely on our own research in this case.

knew which court had entered it and certainly could have accessed that court record to discover the expiration date. [Biological] [f]ather's failure to do so was voluntary, and his argument is unavailing in this regard."). Thus, the Court of Appeals held that clear and convincing evidence supported a finding that biological father's failure to visit the child was willful.

Here, it was undisputed that the order of protection was dissolved in the Spring of 2011, more than a year before the filing of the termination petition. As such, under the reasoning of *Kiara*, if Father was aware of the order of protection, he must also be charged with an awareness of its dissolution. *Id.* Further, nowhere in his testimony does Father indicate that his efforts to see the child were chilled by the order of protection; instead, Father simply made no efforts, as evidenced by his own Statement of Admissions. Under these circumstances, the dissolved order of protection is no excuse for Father's failure to visit his child.

We next consider whether Father's visitation petition is sufficient to show that he did not willfully abandon the child, based on the Tennessee Supreme Court's opinion in *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007). *In re Adoption of A.M.H.* involved a termination of rights petition filed by the guardians of the child against the child's biological parents on the ground of abandonment by willful failure to visit. *Id.* at 796. The biological parents of the child undisputedly exercised no visitation with the child in the relevant four-month period. *Id.* at 801–02. However, immediately prior to the four-month period, custodial parents refused to permit biological parents to take the child from the guardians' home for family pictures and the police were called to escort biological parents off the guardians' property. *Id.* at 801. Less than a month later, biological parents sought judicial intervention to regain physical and legal custody of their child. A few months later, biological parents filed a petition to regain custody of the child, and parents were actively litigating that case when the guardians filed their termination petition. *Id.* at 802. The Tennessee Supreme Court concluded that these facts failed to establish willful failure to visit, stating:

> Here, we are presented with a situation in which the parents of [the child] actively pursued legal proceedings to regain custody of [the child] during the "abandonment" period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights. . . .We hold that the evidence in this case does not support a finding that the parents intentionally abandoned the [child].

*Id.* at 810. The Court further explained its holding, opining:

> Th[e] undisputed evidence does not support a finding that the [biological] parents' failure to visit [the child] was willful. Where, as here, the [biological] parents' visits with their child have resulted in enmity between the parties and where the [biological] parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a "willful failure to visit" as a ground for abandonment. Therefore, we hold that there has been no willful abandonment and reverse the termination of parental rights.

*Id.* at 810–11 (footnote omitted). Thus, the Tennessee Supreme Court held that even where a parent has not visited a child in the relevant four-month period, that fact alone is insufficient to support a finding of willful failure to visit where visitation has been thwarted by the other party and the parent is actively pursuing legal proceedings to regain custody or visitation with the child.

The holding in *In re Adoption of A.M.H.* has been examined and followed in subsequent cases, including *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252 (Tenn. Ct. App. Apr. 27, 2007). In *Chelbie*, the biological mother and step-father to a child filed a petition to terminate the parental rights on the ground of abandonment by failure to visit and/or support the child. The trial court specifically found that biological father had not visited or attempted to visit the child in the relevant four-month period, which finding was not disturbed on appeal. Biological father had, however, filed a petition to establish visitation with the child that had not been resolved as of the filing of 'and step-father's termination petition. Thus, the issue presented was: "[W]hether a parent who, during the four months immediately preceding the filing of a petition to terminate his parental rights, is actively pursuing a court order to establish visitation rights and support obligations has willfully abandoned the child as proscribed in Tenn. Code Ann. § 36-1-113(g)(1)." *Id.* at *4.

Specifically, in *Chelbie*, the evidence showed that biological father had pursued three separate petitions regarding visitation with the child: one shortly after the birth of the child, which was resolved without court intervention when the parties agreed to resume joint parenting; one to modify the previous order to set a visitation schedule, which was ultimately dismissed when biological father was unable to serve mother with

process; and a third petition that biological father was actively pursuing when mother and step-father filed their termination petition. ***Id.*** at \*1–\*2. Indeed, the evidence showed that mother and step-father only filed their termination petition when the judge presiding over the visitation case remarked that the visitation case would be "preempted" if mother and step-father filed a termination petition. ***Id.*** at \*2. Mother and step-father apparently took the trial court's observation to heart and subsequently filed their termination petition, which caused the visitation petition to be stayed pending the termination petition's resolution. ***Id.***

The Court of Appeals concluded that biological father's actions prior to the filing of the termination petition indicated that he did not willfully fail to visit the child. The ***Chelbie*** Court cited ***In re Adoption of A.M.H.*** as precedent that a parent actively pursuing legal proceedings may not be found to have willfully failed to visit a child:

> The Tennessee Supreme Court has recently addressed this question in ***In re Adoption of A.M.H.***, 215 S.W.3d 793 (Tenn. 2007). In that case, the court concluded that redirection of "efforts at maintaining a parent-child relationship to the courts" is inconsistent with a finding of "willful failure to visit' as a ground for abandonment." ***In re Adoption of A.M.H.***, 215 S.W.3d at 810. . . .
>
> There are, to be sure, differences between the facts of this case and the facts of ***In re Adoption of A.M.H.*** The biological parents in ***In re Adoption of A.M.H.*** had attempted to visit their child just five days before the beginning of the pivotal four-month period and had been ordered by the police to leave and to never return again. There is no evidence in the case before us of recent efforts to visit or acrimonious confrontations shortly before or during the four-month period. However, it is undisputed that [mother] did nothing to foster or encourage visitation by or support from [biological father]. In fact, she conceded that ever since their final visitation in October 1999, she did not want [biological father] to visit [the child] and that she did not want to accept any financial support from him. She had, in her own words, decided to "move on." Accordingly, the facts of this case and those of ***In re Adoption of A.M.H.***, are similar in that they involve circumstances in which the child's custodians did not favor

-22-

and had not encouraged the development of a relationship between the biological parent and the child.

The Tennessee Supreme Court's decision in *In re Adoption of A.M.H.* controls the outcome of this case. [Biological Father] had filed and was pursuing a petition to establish his visitation rights and support obligations before the petition to terminate his parental rights was filed. His pursuit of a judicial remedy is inconsistent with a finding that he willfully failed to support or visit [the child] during the four months immediately preceding the filing of the petition.

*Chelbie*, 2007 WL 1241252, at *6. Thus, the *Chelbie* Court concluded that biological father's action in actively pursuing visitation with the child through the court system precluded a finding that biological father willfully failed to visit the child.

Recent cases, however, have distinguished both *In re Adoption of A.M.H* and *Chelbie*. For example, in *In re Erykah C.*, No. E2012-02278-COA-R3-PT, 2013 WL 1876011 (Tenn. Ct. App. 2013), the Court of Appeals affirmed the trial court's finding of willful failure to visit, even though biological mother had filed a petition to regain custody of the child in the relevant four-month period. In *Erykah*, biological mother alleged that her efforts to visit with the child were rebuffed and that, instead, she was advised to seek judicial intervention. She subsequently filed a petition to regain custody within the four months preceding the filing of the termination petition. On appeal, biological mother argued that there could be no finding that her failure to visit the child was willful because her petition evidenced that she lacked the intent to abandon her child. *Id.* at *5. The Court of Appeals, however, concluded that biological mother was not actively pursuing her custody case, as she missed a court date simply because it was raining that day. *Id.* at *6.

Another recent case distinguished both *In re Adoption of A.M.H* and *Chelbie*, *In re Mark A.L.*, No. M2013-00737-COA-R3PT, 2013 WL 5536801 (Tenn. Ct. App. 2013). In *Mark*, biological father visited two days during the relevant four-month period and filed a petition to set visitation and support one month prior to the filing of the termination petition. Father asserted that based on *In re Adoption of A.M.H* and *Chelbie*, he could not be found to have willfully failed to visit. The Court of Appeals disagreed, explaining:

[Biological] [f]ather relies on *In re Adoption of A.M.H.*, 215

S.W.3d 793 (Tenn. 2007) and *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252 (Tenn. Ct. App. Apr. 27, 2007). In that case [i.e., *In re Adoption of A.M.H.*] the parents were actively pursuing visitation within the courts during the pertinent four-month period and, importantly, the parents had continually visited and maintained a relationship with their child while she was in temporary foster care. *In re Adoption of A.M.H.*, 215 S.W.3d at 798. The record before us reveals that [biological] [f]ather did not actively or continually visit or maintain a relationship with the child at any time. Thus, Father's reliance on *In re Adoption of A.M.H.* is misplaced.

Moreover, [biological] [f]ather's reliance on *Chelbie F.* is also misplaced. In that case the father failed to support or visit with his child for approximately seven years. *In re Chelbie F.*, 2007 WL 1241252 at *1. However, the court found that despite this failure, the father did not willfully abandon his child because he had actively sought visitation rights through the courts for seven years. *Id.* at *6. In fact, the father had filed three petitions for visitation over the seven year period after the mother had concealed the child's whereabouts, discouraged his efforts to visit the child, and spurned his efforts to provide financial support. *Id.* Moreover, the mother admitted that she did not want the father to visit with the child or to provide financial support. *Id.* For these reasons, the court found no abandonment. *Id.* Under the facts of this case, [m]other never excused payment of child support nor did she interfere with or deny visitation, a fact clearly evident from the liberal visitation, including extended trips granted to [g]randmother. Although there is some testimony from the witnesses that indicates a lack of communication, there was no outward denial or refusal to visit. Further, as noted above, [biological] [f]ather failed to accompany [g]randmother on her frequent visits. Accordingly, [biological] [f]ather's visitation was nothing more than token. Tenn. Code Ann. § 36-1-102(1)(C).

The trial court found that the petitioners proved by clear and convincing evidence that [biological] [f]ather failed

to make any significant effort to visit the child or maintain a relationship with him. [Biological] [f]ather admitted that, in the past four years, he has seen the child a mere six to eight times. Moreover, [biological ][f]ather made only one attempt to visit the child during the pertinent four-month period. As the trial court correctly noted, if it were not for [g]randmother's efforts, [biological] [f]ather would have had no contact with child during the past four years.

*Mark*, 2013 WL 5536801, at \*6–\*7. Thus, the *Mark* Court held that *In re Adoption of A.M.H.* was inapplicable because biological father was "not actively or continually" visiting with the child prior to filing of his visitation petition. In addition, the *Mark* Court concluded that *Chelbie* offered no support to Father's case, as unlike in *Chelbie*, there was no evidence that the custodial parent spurned biological father's efforts to visit or support the child.

In another case, *In re Adoption of Angela E.*, 402 S.W.3d 636 (Tenn. 2013), the Tennessee Supreme Court concluded that despite the fact that biological father had filed a visitation petition in the years preceding the termination petition, biological father could be found to have willfully failed to visit the child. The record showed that while Father filed his petition to reinstate his visitation, he took no further action to pursue the matter. Further, biological father "had no reasonable excuse for failing to pursue the petition to reinstate visitation during those two years." The Court concluded that it simply was not a case where a parent was "actively trying to maintain visitation" unlike *In re Adoption of A.M.H.* and *Chelbie*. *Angela*, 402 S.W.3d at 642.

Other courts in dealing with similar arguments on the part of biological parents have characterized the decisions in *In re Adoption of A.M.H.* and *Chelbie* as being based on "circumstances in which the child's custodians discouraged the biological parents from visiting the child and were, to some extent, responsible for the parents' failure to visit during the pertinent four-month period." *In re Keri C.*, 384 S.W.3d 731, 752 (Tenn. Ct. App. 2010); *see also In re Kadean T.*, No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at \*3 (Tenn. Ct. App. Oct. 31, 2014) (no perm. app. filed) (citing *A.M.H.* for the proposition that a custodial parent may not actively "thwart" the visitation of another parent); *In re Taliah L.B.*, No. E2012-02102-COA-R3-PT, 2013 WL 1319573, at \*9 (Tenn. Ct. App. Apr. 2, 2013) (citing *A.M.H.*, and affirming finding of willful failure to visit in spite of testimony that biological mother consulted with juvenile court about regaining custody of the child prior to filing of termination petition, as the limitations

placed on visitation by custodial parents did not amount to significant interference with biological mother's visitation). These courts have concluded that the custodial parents' actions in *In re Adoption of A.M.H.* and *Chelbie* involved some "impediment" to the biological parent's visitation. *Keri*, 384 S.W.3d at 753.

In its ruling, the trial court in this case does not discuss the testimony of the parties, but appears to base its decision solely on the fact that Father filed his petition to set visitation within the relevant four-month period, which the trial court concluded was evidence that he did not intend to abandon his child. As previously discussed, however, intent may be determined by the sum of a party's actions and conduct. *In re Audrey S.*, 182 S.W.3d at 864. Accordingly, we will consider the testimony of the parties, as well as Father's petition.

From our review of the record, the facts in this case are distinguishable from both *In re Adoption of A.M.H.* and *Chelbie*. First, there is no evidence in this case that Father was thwarted in any effort to visit the child by Mother. *In re Adoption of A.M.H.*, 215 S.W.3d at 798. Here, Father admitted that other than one ill-advised drive-by to Mother's home, he made no attempts to see the child after Mother stopped taking the child to paternal grandparents' home in Tipton County. Indeed, the record shows that even those few visits that Father did have with the child after the party's separation were completely facilitated by Mother, who drove the child to Father. Simply put, nothing in the record indicates that prior to the filing of his visitation petition did Father ever take any affirmative action to visit with child. Thus, there can be no finding that Mother thwarted Father's non-existent efforts. *See In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (holding that the only excuse for failure to visit is a significant interference with a parent's efforts to maintain a relationship with the child).

Instead, Father placed all the onus to schedule and facilitate visitation on Mother and even Step-Father. Repeatedly at trial, Father's counsel emphasized that Mother made no effort to seek out Father to have visitation with the child. The situation in this case is highly analogous to this Court's recent Opinion in *Mark*, where there was no evidence that the custodial parent placed any impediment on the non-custodial parent's visitation, and instead, all visits that did occur were the product of an effort made only by the custodial parent. *Mark*, 2013 WL 5536801, at *6–*7. The same is true in this case. While Mother is not entitled to thwart an effort by Father to have a relationship with the child, it was certainly not her burden to ensure that Father exercised visitation with the child.

Additionally, unlike in both *In re Adoption of A.M.H.* and *Chelbie*, here there was

no valid excuse for Father's considerable delay in seeking visitation with the child. As previously discussed in *In re Adoption of A.M.H.*, parents terminated their visits when the visits became so acrimonious that police were called. *In re Adoption of A.M.H.*, 215 S.W.3d at 798. Prior to that incident, however, parents exercised liberal and "continual[]" visitation with the child. After the incident with the police, the parents in *In re Adoption of A.M.H.* quickly sought court intervention. Similarly, in *Chelbie*, biological father was forced to repeatedly return to court to reestablish his right to visit the child throughout the child's life, as the custodial parent spurned biological father's efforts to maintain a relationship with the child. In this case, however, Father simply made no effort to maintain any relationship with the child until the filing of his visitation petition, over two years since his last visit with the child.

Here, no such excuse exists for Father's considerable delay in establishing a relationship with the child. Although Father testified that his finances prevented him filing a visitation petition earlier, nothing in the record indicates that he was prevented from simply asking for visitation from Mother. Father admitted that he knew the address of Mother's home; indeed, he drove by Mother's neighborhood hoping to see Mother and the child in early 2011, far before the termination petition was filed. Moreover, nothing in the record indicates that Mother denied Father any requested visitation; instead, Father simply never requested it. Finally, neither Father nor Mother testified that Father requested visitation with the child when the parties appeared in the Tipton County Juvenile Court in March 2012. Thus, until he filed his visitation petition, Father's actions evinced his intent not to establish a relationship with the child. Under these circumstances, we must conclude that Father's visitation petition was merely a token effort at establishing visitation. *See* Tenn. Code Ann. § 36-1-102(1)(C) (defining "token visitation" as "under the circumstances of the individual case, . . . nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child"). Thus, the trial court erred in finding that Petitioners failed to prove that Father willfully failed to visit with the child pursuant to Tennessee Code Annotated Section 36-1-102.

### Best Interest

In this case, the trial court disposed of Petitioners' termination petition on the basis that they failed to prove grounds for the termination. Thus, the trial court did not consider whether termination was in the child's best interest. This Court has reversed the trial court's findings with regard to the grounds for termination. A finding that grounds exist for termination, however, is not the end of the inquiry. This Court has observed that

"before a court in this State can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child." ***State, Dept. of Children's Services v. Hood***, 338 S.W.3d 917, 928 (Tenn. Ct. App. 2009). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then "the interests of parent and child diverge." ***In re Audrey S.***, 182 S.W.3d at 877. The focus shifts to the child's best interest. ***Id.*** Because not all parental conduct is irredeemable, "Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." ***Id.*** However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Because the trial court did not reach the issue of whether termination was in the child's best interest, this cause must be remanded back to the trial court for a determination of whether termination of Father's parental rights is in the best interest of the child, which must be supported by appropriate findings of fact and conclusions of law. *See* ***In re Adoption of Angela E.***, 402 S.W.3d 636, 643 (Tenn. 2013) (indicating that the appropriate procedure when an appellate court reverses a trial court on whether grounds exist for termination, is to remand to the trial court for a determination of whether termination is in the child's best interest).

## Conclusion

The judgment of the Shelby County Chancery Court is affirmed in part, reversed in part, and remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed one-half to Appellants Shanna R.C. and Joseph C.C., and their surety, and one-half to Appellee, Evan R.W., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE